IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RICHARD DICKMAN <u>et al.</u>      *
                                 *
                                 *
v.                               *      Civil Action No. WMN-16-192
                                 *
BANNER LIFE INSURANCE            *
COMPANY <u>et al.</u>            *
                                 *

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

### MEMORANDUM

Before the Court is a Motion to Dismiss and to Strike filed by Defendants Banner Life Insurance Company (Banner) and Legal & General America, Inc. (LGA), ECF No. 38, as well as a Motion to Dismiss, or in the Alternative, to Strike, filed by Defendant Legal & General Group PLC (LG Group), ECF No. 39.  Plaintiffs filed a consolidated opposition to these motions, ECF No. 42, and Defendants filed replies.  ECF No. 50 (Banner's and LGA's) and ECF No. 52 (LG Group's).  The motions are now fully briefed. Upon a review of the parties' submissions and the applicable case law, the Court determines that no hearing is necessary, Local Rule 105.6, and that LG Group's motion will be granted and the motion of Banner and LGA will be granted in part and denied in part.

### I. FACTUAL AND PROCEDURAL BACKGROUND

This case relates to certain universal life insurance policies issued by Defendant Banner and purchased by Plaintiffs

Richard J. Dickman and Kent Alderson.  Banner is a for-profit life insurer organized under Maryland law with its principal place of business in Frederick, Maryland.  Banner is wholly owned by Defendant LGA, a financial holding company organized under Delaware law with its principal place of business also in Frederick, Maryland.  LGA is wholly owned and controlled by Defendant LG Group,[1] which is organized under the laws of the United Kingdom and has its principal place of business in London.

Under the terms of the policies at issue, the policyholders were required to pay a minimum premium to keep the policy in force for a guaranteed period of 20 years.  The policyholder could elect to pay more than the minimum required premium and any amount over the minimum premium would be held by the insurance company and invested for the benefit of the policyholder.  At the end of the guaranteed 20 year period, those funds could be used to further extend insurance coverage, be received by the policyholder if the insurance contract is surrendered or, in the event of the insured's death, be paid out to the beneficiary as an additional benefit above the stated death benefit.

---

[1] Defendant LG Group explains in its motion to dismiss that there is an intermediary holding company, Legal & General Overseas Operations Ltd. (LG Overseas), which owns 100% of the stock of LGA and whose stock is 100% owned by LG Group.

Plaintiffs Dickman and Alderson are both residents of Virginia and purchased their universal life policies in 2002. The policies each provided a death benefit of $300,000.  Mr. Dickman's monthly guaranteed premium was $345.71 but he paid an excess premium of $450 each month to accrue a higher cash value in order to ensure coverage past the 20 year guarantee period. Mr. Alderson's monthly guaranteed premium was $110.16[2] but he paid an excess premium of $200 each month.  At least after the initial premium payments, those payments were made by electronic fund transfers from Plaintiffs' bank accounts.

With each premium paid, Banner extracted an expense fee and a Cost of Insurance (COI) fee.  For example, on August 27, 2015, Mr. Dickman paid his $450 excess premium and was charged $18.50 in expenses and $285.58 in COI.  The remaining $145.92 was added to the policy's cash value.  As of August 27, 2015, Mr. Dickman's policy had a total cash value of $26,345.93, which resulted from the years of excess premiums paid and the returns on the investment of those excess premiums.  Similarly, on August 5, 2015, Mr. Alderson paid his $200 excess premium and was charged $11.00 in expense charges and $88.86 for COI.  The remaining $100.14 was added to the policy's cash value.  As of that date, his policy had a total cash value of $24,100.26.

---

[2] Plaintiff Dickman was 65 years old when he purchased the policy.  Plaintiff Alderson was 55 years old.

In October 2015, Banner dramatically increased the COI charged for both policies and it is that sudden increase that gave rise to this action.  Mr. Dickman's COI jumped from $285 to $1,859.72 per month.  Mr. Alderson's COI increased from approximately $93.00 to $667.14 per month.  Because of this increase, the monthly premiums would no longer cover the COI and difference began to be taken from the accumulated cash values of the Plaintiffs' policies.  Because these new inflated COIs will completely drain the cash value in the policies, there will be insufficient reserves to fund the policies beyond the 20 year guarantee period.  Thus, Plaintiffs will receive no additional benefit from their years of paying excess premiums.

On August 19, 2015, shortly before this increase in the COI went into effect, Banner sent a letter to its policyholders stating that the monthly deduction from policy account values for COI and policy fees would be increasing.  Compl., Exs. 5,6. That letter, however, did not specify how much it would increase or how the increase would be calculated.  After Plaintiff Dickman learned of the dramatic nature of the increase, his insurance agent, who happens also to be his son, sent an email to Banner on October 21, 2015.  In response to the email, Banner sent a letter to Dickman's agent representing that the increase was the result of reevaluated assumptions regarding "the number and timing of death claims (mortality), how long people would

4

keep their policies (persistency), how well investments would perform (income) and the cost to administer policies." Compl., Ex. 7 at 2.  The letter further stated that unless Mr. Dickman instructed otherwise, the premium withdrawn by electronic fund transfer would be reduced to the minimum premium, since remitting an excess premium would not extend coverage beyond the 20 year guarantee period.  In the alternative, the letter suggested that Mr. Dickman could surrender the policy for its cash value immediately prior to the COI change.  Mr. Dickman elected to surrender his policy.  Mr. Alderson did not inquire about the COI increase and did not receive a similar letter. Banner continued to withdraw by electric fund transfer the $200 excess premium for Mr. Alderson's policy, even though Banner understood that Mr. Alderson would receive no benefit from that excess payment.

Plaintiffs contend that the reason presented by Banner for the exorbitant increase in the COI is specious.  The real reason for the increase, as alleged by Plaintiffs, was a scheme through which Banner's cash was funneled to its corporate parent, LGA, and ultimately to LGA's parent, LG Group.  The Complaint goes into considerable detail about the nature and specifics of this scheme but, summarized, the alleged scheme was as follows.

Essentially, LG Group needed cash because it was in a distressed financial condition and Banner had significant cash

on its books.   LG Group wanted that cash and set up an intricate web of wholly-owned subsidiaries to which "extraordinary dividend" payments could be made that would ultimately find their way upstream to LG Group.   Because the insurance industry is a highly regulated industry, these dividends would only be permitted if Banner held sufficient cash reserves.   To create the appearance of sufficient cash reserves to justify the extraordinary dividends, Defendants created a web of wholly-owned captive reinsurers, many of which were incorporated either in states with less stringent insurance regulations than Maryland's or simply off-shore.   Banner then offloaded its liabilities, i.e., its insurance policies, to these captive reinsurers in exchange for phantom or grossly inflated assets so that Banner would appear to have sufficient reserves to permit the distribution of dividends.

Based upon these allegations, Plaintiffs bring the following causes of action: Breach of Contract (Count I); Unjust Enrichment (Count II); Conversion (Count III); and Fraud (Count IV).[3]   Defendant Banner has moved to dismiss Counts II, III, and IV, but makes no arguments for dismissal of the breach of contract claim.   Defendant LGA has moved to dismiss all four

---

[3] The action is filed as a class action, with the class composed of all individuals who purchased insurance policies issued by Banner.

6

counts, as does Defendant LG Group.  Defendant LG Group also moves to dismiss for the additional reason that this Court lacks personal jurisdiction over it.  All Defendants also move to strike Plaintiffs' allegations related to the reinsurance and improper dividends.

## II. LEGAL STANDARD

A complaint must be dismissed if it does not allege "enough facts to state a claim to relief plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." Id. at 555.  Rather, the complaint must be supported by factual allegations, "taken as true," that "raise a right to relief above the speculative level." Id. at 555–56.  The Supreme Court has explained that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

The plausibility standard requires that the pleader show more than a sheer possibility of success, although it does not impose a "probability requirement." Twombly, 550 U.S. at 556. Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." Iqbal, 556 U.S. at 663. Thus, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief. Id. at 664; see also Brockington v. Boykins, 637 F.3d 503, 505–06 (4th Cir. 2011). This Court has held that the Twombly/Iqbal "plausibility standard" also applies to the pleading of jurisdictional facts. Haley Paint Co. v. E.I. Dupont de Nemours & Co., 775 F. Supp. 2d 790, 798–99 (D. Md. 2011).

## III. DISCUSSION

### A. Personal Jurisdiction Over LG Group

In its motion to dismiss, LG Group represents that it has no meaningful contacts with Maryland other than its indirect ownership of LGA and Banner. It is incorporated in the United Kingdom; it is governed by a board of directors which usually meets in the United Kingdom;[4] all of its executive directors and all but one of its non-executive directors live and have their primary place of work in the United Kingdom; its business is conducted under the supervision and oversight of its executive officers, all of whom currently live and have their primary place of work in the United Kingdom. Furthermore, LG Group conducts no business in Maryland other than its normal dealings

---

[4] On a single occasion in the last decade, the board met at LGA's office in Maryland.

with its indirect subsidiaries here, it is not licensed to do business in Maryland, it has no employees who live or have their primary place of work here, and it has no office or business facility here, business address or telephone listing here, and no bank account here.

In response to Plaintiffs' suggestion in their Complaint that this Court has personal jurisdiction over LG Group "due to [its] continuous transactions with the in-state Defendants that gave rise to this claim," Compl. ¶ 16, LG Group relates the following regarding its relationships with LGA and Banner. LG Group and LGA are governed by separate boards of directors and only one director of the five directors on LGA's board is also a member of LG Group's board. Banner's board has seven directors, none of whom are also on LG Group's board. LG Group, LGA, and Banner each maintains separate books and records and have separate financial and bank accounts. While LG Group does set financial goals and targets for its indirect subsidiaries, including LGA and Banner, which includes targets for dividends to be paid to their respective shareholders, those dividend payments are ultimately approved by the boards of the entities that make them. LG Group also provides overall strategic direction and guidance and, from time to time, technical services and advice to its subsidiaries, including LGA and Banner. In addition, certain major decisions and expenditures

by, or events involving, LG Group's subsidiaries either are reported to LG Group by the subsidiaries, or approval is obtained from LG Group before they are executed.  LG Group does not control, dictate, or oversee the day-to-day business operations or decisions of its subsidiaries.

Based upon these facts, LG Group contends that this Court has neither general jurisdiction nor specific jurisdiction over it.  There is no question that there is no general jurisdiction over LG Group.  General jurisdiction, which permits a defendant to be haled into court to answer for any claim, is only established in this Court if a defendant's affiliations with Maryland are "so continuous and systematic as to render [it] essentially at home" here.  Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011).  LG Group certainly is not "essentially at home" in Maryland.

Under specific jurisdiction, however, the "commission of certain 'single or occasional acts' in a State may be sufficient to render a corporation answerable in that State with respect to those acts."  Goodyear, 564 U.S. at 923 (quoting International Shoe v. Washington, 326 U.S. 310, 318 (1945)).  For a court to exercise specific jurisdiction over a defendant, "the defendant's suit-related conduct must create a substantial connection with the forum State."  Walden v. Fiore, 134 S. Ct. 1115, 1121 (2014).  The Supreme Court has found relevant two

10

aspects of this necessary relationship with the forum State.
"First, the relationship must arise out of contacts that the
'defendant himself' creates with the forum State."  Id. (quoting
Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)).
"Second, our 'minimum contacts' analysis looks to the
defendant's contacts with the forum State itself, not the
defendant's contacts with persons who reside there."  Id.
(citing International Shoe, 326 U.S. at 319).  Citing the
representations referenced above, LG Group argues that it has
engaged in no conduct in Maryland, related or unrelated to the
subject of this suit.

Once the defendant challenges personal jurisdiction,
the plaintiff "bears the burden of demonstrating personal
jurisdiction at every stage following such a challenge."
Grayson v. Anderson, 816 F.3d 262, 267 (4th Cir. 2016).  In
their opposition, which Plaintiffs caption as an opposition to
LG Group's motion as well as the motion filed by LGA and Banner,
Plaintiffs make no argument, whatsoever, as to whether there is
personal jurisdiction over LG Group.  Notably, in their
discussion of the applicable legal standards, they completely
omit any discussion of the standard for a motion to dismiss for
lack of personal jurisdiction under Rule 12(b)(2).  In arguing
the merits of their breach of contract claim, Plaintiffs make
passing reference to "pierc[ing] the corporate veil" to permit

the attribution of Banner's conduct to LGa and LG Group, but they acknowledge that they have no facts to support that argument as to LG Group.  ECF No. 42 at 32.[5]

In light of Plaintiffs' failure to make any response to LG Group's challenge to this Court's ability to exercise personal jurisdiction over it, LG Group's motion will be granted and LG Group will be dismissed.[6]

## B. Choice of Law

A federal court exercising diversity jurisdiction applies the choice of law rules of the state in which it sits. Perini/Tompkins Joint Venture v. Ace Am. Ins. Co., 738 F.3d 95, 100 (4th Cir. 2013).  For contract claims, Maryland courts generally follow the rule of lex loci contractus, "which

---

[5] Plaintiffs do point to various communications from Banner which include LGA's logo as evidence that the legal distinction between LGA and Banner is "one of form rather than substance." Id. at 33.  That argument is addressed, infra.

[6] The Court posits that Plaintiffs' failure to respond to the jurisdictional challenge may reflect the acknowledgement of the futility of such an argument.  "Maryland generally is more restrictive than other jurisdictions in allowing a plaintiff to pierce the corporate veil" to find personal jurisdiction over a foreign parent corporation.  Haley Paint, 775 F. Supp. 2d at 797; see also, Burns & Russell Co. of Baltimore v. Oldcastle, Inc., 198 F. Supp. 2d 687, 697-98 (D. Md. 2002) (noting that Maryland courts apply the "agency" test in deciding to pierce the corporate veil for jurisdictional purposes and that "test allows a court to attribute the actions of a subsidiary corporation to the foreign parent corporation only if the parent exerts considerable control over the activities of the subsidiary"); Newman v. Motorola, Inc., 125 F. Supp. 2d 717, 722-23 (D. Md. 2000) (same).

requires that the construction and validity of a contract be
determined by the law of the state where the contract is made."
Roy v. Northwestern Nat'l Life Ins. Co., 974 F. Supp. 508, 512
(D. Md. 1997).  A contract is made where the last act necessary
to make the contract binding occurs.  Id.  On these general
principles, the parties agree.  Where they disagree is
determining what was the "last act necessary" to form the
insurance contracts at issue.

In the context of insurance contracts, Maryland courts have
held that the last act necessary is "[t]ypically . . . where the
policy is delivered and the premiums are paid."  Sting Sec.,
Inc. v. First Mercury Syndicate, Inc., 791 F. Supp. 555, 558 (D.
Md. 1992); see also, TIG Ins. Co. v. Monongahela Power Co., 58
A.3d 497, 507 (Md. Ct. Spec. App. 2012) (noting that "Maryland
appellate courts have consistently held that '[t]he locus
contractu of an insurance policy is the state in which the
policy is delivered and the premiums are paid,'") (quoting
Cont'l Cas. Co. v. Kemper Ins. Co., 920 A.2d 66, 69 (Md. Ct.
Spec. App. 2007)).  Defendants represent that the policies were
delivered to Plaintiffs at their homes in Virginia and that
Plaintiffs paid their first premiums from Virginia and, thus,
Virginia law applies to Plaintiffs' contract claims.

Without explicitly denying that the insurance contracts
were delivered or premiums paid in Virginia, Plaintiffs seem to

suggest that the last act necessary to make the contracts
binding was Banner's execution of the Policies in its Maryland
offices on the policies' respective "Policy Dates."  ECF No. 42
at 9-10.  Because Plaintiffs allege that the policies became
effective on their Policy Dates, they conclude that Banner's
countersigning the policies in Maryland was the last act
necessary.  In some prior decisions, this Court has concluded
that "the place of countersigning is held to be the place of the
making of the contract, because the counter-signature is the
last act necessary to effectuate the policy."  Millennium
Inorganic Chems. Ltd. v. Nat'l Union Fire Ins. Co. of
Pittsburgh, PA, 893 F. Supp. 2d 715, 725-26 (D. Md. 2012)
(internal quotation marks omitted); see also, Rouse Co. v. Fed.
Ins. Co., 991 F. Supp. 460, 464-65 (D. Md. 1998) (same).  That
approach, however, has been expressly rejected by the Maryland
Court of Special Appeals when it reaffirmed that, under
traditional offer and acceptance rules, the "last act[s]"
necessary to form an insurance policy are the delivery of the
policy to the insured and the insured's payment of premiums.
Monongahela Power, 58 A.3d at 509; see also, Nautilus Ins. Co.
v. REMAC America, Inc., 956 F. Supp. 2d 674, 684 n.9 (D. Md.
2013) (noting the Maryland Court of Special Appeals'
reaffirmation of the delivery of policy and payment of premiums
as last acts necessary for the formation of an insurance

14

contract as over against the place of countersignature).  This is true even where the policy contains an express provision that it shall not be valid unless countersigned.  <u>Monongahela Power</u>, 58 A.3d at 509.

Again, Plaintiffs do not dispute that the policies were delivered to their homes in Virginia, nor do they make any allegations to the contrary.  As to payment of premiums, Plaintiffs contend in their opposition that "premiums were paid by automatic bank withdrawal, which means that payments were initiated by Banner and/or [LGA] from Maryland."  ECF No. 42 at 9.  As support for that contention, Plaintiffs cite to paragraphs in the Complaint that allege that Plaintiffs' monthly premiums were made through automatic bank withdrawal.  <u>Id.</u> (citing Compl. ¶¶ 24, 27).  Those paragraphs, however, make no reference to the initial premium payment and would seem to refer to ongoing monthly premiums.  Defendants assert in their reply that "Plaintiffs know full well that they paid the first premiums on the Policies by check and not by automatic bank withdrawal."  ECF No. 50 at 2.  The applications, at least that of Plaintiff Alderson, would confirm that to be the case.  <u>See</u> ECF No. 54-1 at 2 (referencing premium payment "from account of check attached.").[7]

---

[7] Defendants, in their reply, rather directly call out Plaintiffs and question their candor for implying in their opposition that

Were Plaintiffs to contend that initial premium payments were actually made by automatic withdraw, it would not change the choice of law analysis.  While Defendants may have "initiated" the withdrawal from Maryland, the actual withdrawal would have been made from Plaintiffs' bank accounts in Virginia.  Thus, the Court concludes that Virginia law applies to Plaintiffs' breach of contract claims.  Furthermore, the parties agree that whatever law applies to the breach of contract claims also applies to the quasi-contractual unjust enrichment claims.  Thus, Virginia law also applies to Plaintiffs' unjust enrichment claims.

Under Maryland choice of law rules, tort claims are governed by the law of the state in which the plaintiff suffered injury.  Johnson v. Oroweat Foods Co., 785 F.2d 503, 510-11 (4th Cir. 1986).  "The place of injury is the place where the injury was suffered, not where the wrongful act took place."  Id. at 511; see also, Laboratory Corp. of America v. Hood, 911 A.2d 841 (Md. 2006) (noting that Maryland continues to adhere generally to the lex loci delicti principle in tort cases . . . [applying] the law of the State where the injury — the last event required

---

initial premiums were made by automatic bank withdrawal.  While surreplies are only permitted with leave of Court, Local Rule 105.2.a, the Court would have anticipated a request for leave to file a surreply were Plaintiffs actually alleging that the initial premiums were paid by automatic bank withdrawals.  In the undersigned's experience, the payment of initial insurance premiums by that method would be rare indeed.

to constitute the tort — occurred"). In the fraud count of their Complaint, Plaintiffs allege that, in reliance on Defendants' false statements, they suffered compensable injuries because they "continued to pay premiums and excess premiums long after they otherwise would have," they "did not attempt to obtain alternative life insurance policies," Plaintiff Dickman "allowed Banner to withdraw the increased COI charges from his policy's cash value, and subsequently surrendered his policy without obtaining the benefit for which he paid for over twelve years," and Plaintiff Alderson "continued to pay excess premiums and allowed Banner to withdraw the increased COI charges from his policy's case value." Compl. ¶¶ 272, 273. These alleged injuries were all suffered in Virginia, where Plaintiffs reside. Accordingly, Virginia law applies to Plaintiffs' fraud claims as well.

Finally, as to Plaintiffs' conversion claims, the last act necessary to complete the tort was the alleged misappropriation of the funds from Plaintiffs' accounts. This would have occurred when the funds were deposited in Banner's accounts in Maryland. The parties agree that Plaintiffs' conversion claim is governed by the law of Maryland. See ECF No. 42 at 11 n.6 ("Plaintiffs agree with the Defendants that Maryland law governs the Conversion claim. . . .").

## C. Unjust Enrichment

Under Virginia law, unjust enrichment is an implied contract action based on the principles of equity.  Kern v. Freed Co., Inc., 299 S.E.2d 363, 365 (Va. 1983).  "To avoid unjust enrichment, equity will effect a contract implied in law, i.e., a quasi-contract, requiring one who accepts and receives the services of another to make reasonable compensation for those services." Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 165 (4th Cir. 2012) (applying Virginia law, citations and internal quotation marks omitted).  A condition precedent to the assertion of such a claim, however, is that no express contract exists between the parties.  Vollmar v. CSX Transp., Inc., 705 F. Supp. 1154, 1176 (E.D. Va. 1989); see also, WRH Mortg., Inc. v. S.A.S. Associates, 214 F.3d 528, 534 (4th Cir. 2000) ("Where a contract governs the relationship of the parties, the equitable remedy of restitution grounded in quasi-contract or unjust enrichment does not lie.").  It has been long established that "an express contract defining the rights of the parties necessarily precludes the existence of an implied contract of a different nature containing the same subject matter."  Southern Biscuit Co., Inc. v. Lloyd, 6 S.E.2d 601 (Va. 1940).

Here, the subject matter of Plaintiffs' unjust enrichment claim is covered by an express contract.  To recover under a theory of unjust enrichment, Plaintiffs must demonstrate that

"(1) [Plaintiffs] conferred a benefit on [Defendants]; (2) [Defendants] knew of the benefit and should reasonably have expected to repay [Plaintiffs]; and (3) [Defendants] accepted or retained the benefit without paying for its value." Schmidt v. Household Fin. Corp., II, 661 S.E.2d 834 (Va. 2008).  The benefit conferred on Defendants under Plaintiffs' unjust enrichment theory is simply the premiums and excess premiums that Plaintiffs paid to Banner.  Compl. ¶ 252.  Plaintiffs then suggest that LGA and Banner improperly retained that benefit by "unlawfully raid[ing] Plaintiffs' cash value accounts under the guise of a justified contractually mandated increase in COI." Id. ¶ 256.  Plaintiffs' payment of premiums and what Banner was to do with those payments clearly fall within the scope of the insurance contracts and, thus, Plaintiffs' unjust enrichment claims cannot stand.

### D. Conversion

In support of their conversion claims, Plaintiffs allege that they had acquired significant cash values as part of their universal life insurance policies and that those "cash values were specific and identifiable, and were the Plaintiffs' personal property."  Compl. ¶ 263.  They further allege that Defendants, by "caus[ing] money to be withdrawn from Plaintiffs' cash value accounts and deposited into [Defendants'] account . . . exerted ownership and dominion over the Plaintiffs' personal

19

property in denial of the Plaintiffs' rights." Id. ¶¶ 264-65. This, Plaintiffs contend, resulted in a conversion of their personal property.

"A defendant converts a plaintiff's personal property where the defendant intentionally exerts 'ownership or dominion over [the plaintiff]'s personal property in denial of or inconsistent with the [plaintiff]'s right to [the plaintiff's personal] property.'" Thompson v. UBS Financial Servs., Inc., 115 A.3d 125, 127 (Md. 2015) (quoting Nickens v. Mount Vernon Realty Grp., LLC, 54 A.3d 742, 756 (Md. 2012)). Defendants contend, ECF No. 38-1 at 13, and Plaintiffs concede, ECF No. 42 at 20, that the general rule is that monies are intangible and therefore not subject to a claim for conversion. See Lawson v. Commonwealth Land Title Ins. Co., 518 A.2d 174, 177 (Md. Ct. Spec. App. 1986); Allied Inv. Corp. v. Jasen, 731 A.2d 957, 966 (Md. 1999). Plaintiffs argue, however, that because they allege that Defendants "converted specific segregated and identifiable funds," the assertion of a claim for conversion is appropriate. ECF No. 42 at 20.

Maryland courts have gradually recognized a narrow exception to the general rule that monies are not subject to a claim of conversion. In Lawson, the Maryland Court of Special Appeals traced the expansion of this tort and noted that, while an action for conversion "will lie to recover money, i.e.,

20

currency, as money is a chattel, the action is not maintainable for money unless there be an obligation on the part of the defendant to return the specific money entrusted to his care." 518 A.2d at 176 (internal quotation omitted).  "When there is no obligation to return the identical money, but only a relationship of debtor or creditor, an action for conversion of the funds representing the indebtedness will not lie against the debtor."  Id.; see also, Coots v. Allstate Life Ins. Co., 313 F. Supp. 2d 539, 543 (D. Md. 2004) (holding that insurance proceeds were not subject to conversion because the plaintiff "cannot, certainly, point to any particular currency as the subject of the purported conversion"); Darcars Motors of Silver Spring, Inc. v. Borzym, 841 A.2d 828, 834 n.3 (Md. 2004) (opining that the recovery of a down-payment on an automobile purchase under a claim of conversion was not actionable because defendant "did not have an obligation to return the specific bills used for the down-payment).

In a conclusory manner, Plaintiffs alleged in their Complaint that the cash values in their accounts were "specific and identifiable."  To support this allegation, they argue in their opposition that it is "disingenuous for Defendants to suggest that the money was not segregated and identifiable when Banner and LGA sent annual account statements to each Plaintiff informing them as to the precise amount in the Account Value for

each month of the policy year." Id. at 24.  Moreover, they note, the Complaint specifically alleges that "Mr. Dickman's Account Value was $26,345.93 as of August 27, 2015, and that Mr. Alderson's Account Value was $24,100.26 on August 5, 2015." Id. (citing Compl. ¶¶ 25 & 29).

As Defendants correctly note, if by simply alleging that the funds converted were of a specific sum, the rule that monies are not subject to conversion would be swallowed by the exception.  While the Court is required, at this stage of the litigation, to take all factual allegations as true, it need not accept as true a legal conclusion couched as a factual conclusion.  Twombly, 550 U.S. at 555.  Here, Plaintiffs' premiums were sent monthly to Banner by electronic fund transfers and the excess invested and presumably earned returns on those investments.  That a specific dollar value can be computed for the excess premiums and investment returns does not render the resulting cash values to be "specific and identifiable" for purposes of a conversion claim.  These claims will be dismissed.

### E. Fraud

The substance of Plaintiffs' fraud claims is as follows. In the years following Plaintiffs' purchase of their universal life policies, but before Plaintiffs were told of the dramatic COI increase, Banner issued numerous financial statements and

public statements regarding its alleged financial health. Plaintiffs maintain that these statements were false and hid from Plaintiffs and others the eroding profitability of the policies and financial condition of the company. Plaintiffs alleged that Banner knew, long before it sent notice of the COI increases, that COI charges did not adequately account for future experiences but instead chose to represent to policyholders that the policies were performing adequately. Compl. ¶ 206.

Plaintiffs further allege that, in reliance on these statements, they continued to make excess premium payments with the expectation that these excess payments would extend the term of the policies beyond that guaranteed 20 year period. As resulting damages, Plaintiffs assert that they continued to pay premiums far longer than they would have had they known the true state of Banner's financial health. They also assert that they were damaged in that their reliance on the belief that their excess premium payments would provide them with life insurance beyond the 20 year guarantee period deterred them from looking for and obtaining alternative insurance protection.

In addition to arguing that the Complaint fails to sufficiently allege the elements of a fraud claim, Defendants make two preliminary arguments challenging that claim. First, they assert that Plaintiffs lack Article III standing to assert

these claims.  Second, Defendants posit that Plaintiffs' fraud claims are barred by Virginia's "economic loss" or "source of duty" rule.  As explained below, however, the gravamen of these preliminary arguments is closely related to the failure to state a claim argument.

To establish Article III standing, a plaintiff must show "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision."  Susan B. Anthony List v. Driehaus, --- U.S. ----, 134 S. Ct. 2334, 2341 (2014) (internal quotations omitted).  In arguing a lack of standing, Defendants contend that Plaintiffs have failed to allege an "injury in fact" caused by the alleged fraudulent statements.

Defendants suggest that this case is analogous to Ross v. AXA Equitable Life Insurance Co., 115 F. Supp. 3d 424 (S.D.N.Y. 2015), where the court found that insurance policyholders had no Title III standing to challenge "shadow insurance" transactions in connection with the insurer's life insurance business. Similar to Plaintiffs' allegations here, the Ross plaintiffs alleged that their insurer was using captive reinsurers to make it appear that it had higher reserves than it actually had. Like Plaintiffs here, the Ross plaintiffs alleged that the annual financial disclosures issued by the insurer were

24

misleading because they failed to disclose the details of the shadow insurance transactions thereby making the insurer's financial health appear stronger than it actually was.

In holding that the insured plaintiffs in Ross did not have standing to bring a suit alleging violations of New York insurance law, the Court concluded that the plaintiffs failed to show that they suffered any individualized, concrete injury in fact. The court specifically noted that the "Complaint does not allege that, as a result of having purchased or paid premiums for those life insurance policies, Plaintiffs themselves were injured, financially or otherwise. Plaintiffs do not allege, for example, that they paid higher premiums as a result of [the insurer]'s misrepresentations." Id. at 435. As for the plaintiffs' claims that they faced the risk of harm in the future that the insurer would be unable to pay their claims when eventually made, the court found that theory of injury "far too hypothetical, speculative, and uncertain to constitute an 'imminently threatened injury' worthy of federal judicial intervention." Id. at 437.

Unlike the Ross plaintiffs, however, Plaintiffs here do allege an individualized injury in fact. Relying on Banner's representations as to the performance of the subject policies, they allege that they continued to make excess payments for which they received no benefit. They further allege that, had

25

they been given an accurate picture of Banner's financial
health, they would not have continued to make those payments for
as long as they did.  If Plaintiffs prevail on their fraud
claims, that injury would be redressed by the return of at least
the excess premiums paid after the point that Banner was aware
that the inevitable increase in the COI would engulf those
excess premiums.  The Court finds that Plaintiffs have standing
to pursue their fraud claims.

     The second potential bar to Plaintiffs' fraud claims
posited by Defendants is Virginia's economic loss or source of
duty rule.  Under that rule, "a tort claim normally cannot be
maintained in conjunction with a breach of contract claim."
Erdmann v. Preferred Research, Inc., 852 F.2d 788, 791 (4th Cir.
1988) (internal citations omitted).  The principle underlying
the rule is that, "[t]ort law is not designed [] to compensate
parties for losses suffered as a result of a breach of duties
assumed only by agreement."  Sensenbrenner v. Rust, Orling &
Neale, Architects, Inc., 374 S.E.2d 55, 58 (Va. 1988).
"[L]osses suffered as a result of the breach of a duty assumed
only by agreement, rather than a duty imposed by law, remain the
sole province of the law of contracts."  Filak v. George, 594
S.E.2d 610, 613 (Va. 2004).

     An exception to this rule that tort claims cannot be
brought in conjunction with contract claims, however, "arises

where a party establishes an independent, willful tort that is factually bound to the contractual breach but whose legal elements are distinct from it." Erdmann, 852 F.2d at 791 (internal citations omitted).  The typical claims arising under this exception fall into the category of "fraud in the inducement" claims.  In these claims, "a statement, known to be false when uttered, that is made with the intent to induce someone to enter into a contract, can support a claim of fraud that is independent of a breach of contract." Barnette v. Brook Rd., Inc., 429 F. Supp. 2d 741, 749–51 (E.D. Va. 2006); see also, Flip Mortgage Corp. v. McElhone, 841 F.2d 531 (4th Cir. 1988) (holding that "fraud can be found in a breach of contract if the defendant did not intend to perform at the time of contracting") (citing, Colonial Ford Truck Sales v. Schneider, 325 S.E.2d 91 (Va. 1985)).  In explaining why the economic loss rule does not bar a fraud in the inducement claim, the United States District Court for the Eastern District of Virginia opined,

> The law of contract requires a person to abide by his promises; the law of tort imposes a separate duty, "i.e., the duty not to commit fraud." [City of Richmond, Va. v. Madison Management Group, Inc., 918 F.2d [438] at 447 [(4th Cir. 1990)].  Because the defendant had breached both a contractual duty and a legal duty imposed by tort law, the court held that the defendant was "not entitled to the protection of the economic loss rule, which protects only those defendants who have breached only contractual duties." Id.

<u>Tidewater Beverage Services, Inc. v. Coca Cola, Inc.</u>, 907 F. Supp. 943, 948 (E.D. Va. 1995).

Plaintiffs' fraud claim is certainly not a "fraud in the inducement" claim in the typical sense in that the alleged false statements were made well after Plaintiffs initially purchased their insurance policies.  An inference can be made, however, that the positive financial statements, which Plaintiffs allege were known to be false when made, were made to induce Plaintiffs to continue to submit their excess premium payments when they would not have if they knew the true performance of the policies.  The Court finds these allegations sufficiently akin to a fraud in the inducement claim to permit Plaintiffs' fraud claims to escape the bar of the economic loss rule, at least at this stage of the proceedings.

Finally, the Court finds that Plaintiffs have sufficiently stated a claim for fraud, albeit, a claim that is limited in scope.  To state a claim for fraud, a plaintiff "must prove by clear and convincing evidence (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him." <u>Thompson v. Bacon</u>, 425 S.E.2d 512, 514 (Va. 1993).  In addition, averments of fraud must meet the heightened pleading standards of Rule 9(b).  Under that Rule, "a party must state with particularity the circumstances

constituting fraud." This particularity requires allegations as to "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999).

As set forth in the above discussion, Plaintiffs allege that Banner continued to make annual financial disclosures that Banner knew to be false in order to encourage its policyholders to continue to make premium payments. Plaintiffs allege that they reasonably relied on those statements and continued to make excess premium payments for which they ultimately received no benefit and thus were damaged. The Court finds these allegations sufficient under Rule 9(b) to state a fraud claim against Banner arising out of these allegedly fraudulent annual disclosures.[8]

The Court notes that the scope of Plaintiffs' fraud claim is limited. For example, in addition to Banner's allegedly false annual disclosures, Plaintiffs allege that "[a]s a result

---

[8] While sufficient at this stage of the litigation, the claim may prove difficult to establish on summary judgment or at trial. Defendants suggest that it is likely that Plaintiffs never saw Banner's financial statements until they were preparing to file this suit. ECF No. 38-1 at 22. Plaintiffs, however, allege that they relied on these statements, Compl. ¶ 272, and therefore it must be inferred that they did see them. That Mr. Dickman's son was the insurance agent might make it more likely that Mr. Dickman, anyway, would have seen the annual statements.

of the improper and fraudulent COI increase the[] excess premiums were rendered valueless." ECF No. 42 at 27. In their opposition, they cite the August 19, 2015, letters informing them of the increase as another example of a fraudulent statement on which they relied to their detriment. Id. at 31. Whether the COI increase was improper, however, is a matter of contract, not tort. Furthermore, while Plaintiffs may assert that the reason given for the increase was false, they do not explain how the reason behind the increase would have altered their decision to surrender the policy, as did Dickman, or continue to make payments, as did Alderson.

The Court also finds that Plaintiffs' fraud claim is limited to a claim against Banner in that there are insufficient allegations regarding any fraudulent statements of LGA to satisfy Rule 9(b). While Plaintiffs make general allegations that Banner and LGA had knowledge that higher COIs would be necessary, Compl. ¶ 207, the alleged fraudulent statements about the policies and financial condition of Banner are those of Banner. See, e.g., id. ¶ 207 ("Yet, Banner continued to send annual statements that it knew to be false"), ¶ 219 (referencing Banner's annual statements). Plaintiffs make a tenuous argument that the presence of LGA's logo on some of the correspondence from Banner renders "any distinction between LGA and Banner . . . merely one of form rather than substance," ECF No. 42 at 33,

but courts have rejected similar efforts to foist liability on a parent for the acts of a subsidiary.  See GS2 Eng'g & Envtl. Consultants, Inc. v. Zurich Am. Ins. Co., 956 F. Supp. 2d 686, 691 (D.S.C. 2013) (holding that the presence of a parent's logo on declaration pages and endorsements of insurance policies and the use of parent's letterhead by claim representative was insufficient to pierce the corporate veil and impose liability on the parent where there was no evidence that the parent wrote the policies at issue).

### F. Contract Claim Against LGA

For similar reasons, the Court finds that Plaintiffs cannot assert breach of contract claims against LGA.  In their count for breach of contract, Plaintiffs allege that "Plaintiffs each entered in a contract with Banner when they purchased their life insurance policies."  Compl. ¶ 246 (emphasis added).  In a somewhat cryptic argument in their opposition, Plaintiffs acknowledge "[o]nly on its face is it plain that the contract of insurance is with Banner and not the other Defendants," but go on to speculate that "[w]hat is not obvious is which entities within the [LG Group] corporate web are responsible for the obligations created by Plaintiffs' contract."  ECF No. 42 at 32. As Defendants observe, "'[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through

31

ownership of another corporation's stock) is not liable for the acts of its subsidiaries.'"  ECF No. 50 at 18 (quoting United States v. Bestfoods, 524 U.S. 51, 61 (1998)).  Plaintiffs have offered no argument or authority to overrule that general principle as to the alleged breach of contracts into which Plaintiffs entered with Banner.

**G. Motion to Strike**

Under Rule 12(f), a court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  As a general matter, motions to strike are viewed with disfavor and should be denied unless "the allegations have no possible relation to the controversy and may cause prejudice to one of the parties.'"  Graff v. Prime Retail, Inc., 172 F. Supp. 2d 721, 731 (D. Md. 2001) (internal quotation omitted).  Defendants seek to strike from the Complaint the allegations related to Banner's reinsurance and dividends transactions.  Defendants' primary argument is that these allegations of "sham" reinsurance transactions and improper dividend payments are demonstrably false because these transactions and payments were approved by the Maryland Insurance Administration (MIA).  They also argue that these allegations are immaterial to Plaintiffs' causes of action, are prejudicial, and are scandalous and could harm Banner's reputation.

The motions to strike will be denied.  As to the truth or falsity of the reinsurance and dividend transactions, the Court must accept as true those allegations at this stage in the litigation.  Defendants' argument that MIA's approval of the transactions assumes that corporations have never been able to hide the truth from regulatory agencies.  The Court does not accept that assumption.  As to materiality, these allegations are potentially relevant to both the contract and the fraud claim in that they provide an alternative reason for the COI increase other than the reason given by Banner.  As to the scandalous nature of these allegations, they are only scandalous if untrue and, if untrue, Banner will certainly have the opportunity to establish the falsity of those allegations.

## IV. CONCLUSION

For these reasons the Court concludes that Plaintiffs' breach of contract and fraud claims against Banner will go forward and the remaining claims and Defendants will be dismissed.  The remaining claims will be resolved under Virginia law.  Furthermore, Defendants' motions to strike will be denied. A separate order will issue.

_____/s/_____
William M. Nickerson
Senior United States District Judge

DATED: December 21, 2016