IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| **RICHARD DICKMAN; KENT** | ) | |
| **ALDERSON; LESLEY S. RICH,** | ) | |
| **Trustee for RICHARD S.** | ) | |
| **WALLBERG INSURANCE** | ) | |
| **TRUST;** *Individually and on behalf* | ) | |
| *of all those similarly situated,* | ) | **Civil Actions Nos.** |
| Plaintiffs, | ) | |
| v. | ) | 1:16-cv-00192-RDB |
| **BANNER LIFE INSURANCE** | ) | 1 :17-cv-02026-GLR |
| **COMPANY; WILLIAM PENN** | ) | |
| **LIFE INSURANCE COMPANY** | ) | |
| **OF NEW YORK,** | ) | |
| Defendants. | ) | |

## INTRODUCTION TO REPORT AND RECOMMENDATION

This report and recommendations emanate from a Stipulated Order issued by the Honorable Richard D. Bennett, United States District Judge, District of Maryland, appointing the undersigned as a Special Master. The matters discussed herein arise from a dispute among a number of plaintiffs' attorneys who participated in a class action that was settled. The settlement resulted in a joint attorneys' fee in a large amount, *i.e.,* $7,851,001.08. That total gross amount has been approved by Judge Bennett. Remaining is – a s in virtually all major class actions cases – th e allocation of that money among the plaintiffs' attorneys.

After all substantive issues were concluded in the District Court, an appeal was taken by an objecting member of the class to the Fourth Circuit Court in Richmond. That matter is still pending. The appellant's issue does not focus on counsel fees, but appellate fees will at some point, *i.e.,* at the *res judicata* close of

the case as a whole. Because appellate fee matters are not ripe, they will not be taken into account of monetary allocation at this point.

In my first discussions telephonically with the many plaintiffs' attorneys involved in the allocation case, there arose a dispute among them with regard to whether I should wait and do nothing in response to Judge Bennett's Order until the entire case was buttoned up after all appellate and first instance cases are completely concluded. There would then be no question the ultimate total amount of money was reached.

Preliminarily, after telephonic discussion with attorneys who had disparate views on the matter, I decided not to wait for the outcome of the appellate matter, but rather to proceed with a pair of two cardinal issues (with different claimants) regarding the allocation of fees. It was felt by most (but not all) of the counsel involved that there was no substantial reason to wait for the appellate outcome, but to proceed to address issues that are not inherently tied to what might or might not happen in the Court of Appeals. These are major disputes on splitting-up of attorneys' fees among them. I determined there was no reason to wait for the appeal, and that it was in the interest of all concerned to proceed on the likely assumption that the District Court's final decisions would not be reversed on appeal.

## MAJOR PERSONA

The problems now before me essentially emanate from two law firms and two lawyers. It is indisputable that these two lawyers, Mr. "Wally" Walker and Mr. "Dee" Miles III, were associated with two (different) Alabama law firms on January 19, 2016, a cardinal date in the matters now under scrutiny. Mr. Walker was associated with "The Finley Firm" and Mr. Miles with the firm of "Beasley, Allen, Crow, Methvin, Portis, and Miles" (for short, "Beasley"). There are two disputes now. One is a monetary disagreement between the Finley Firm and Mr. Walker. The other is a monetary disagreement between the Geoff McDonald & Associates (GMA) firm and the Beasley firm, a firm including Mr. Miles. (It is noted that Mr. Miles had some connection with the Finley firm, stopping payment of the 23.4% he had formerly written to Finley would be sent to that Firm,)

2

## BASIC INTRODUCTION: THE AGREMENT

One might say that the present inquiry generally tests the old saying, "As you sow, so shall you reap." The seed was planted into an agreement among law firm attorneys. They were not said to have been duped in any way, were experienced attorneys, and they certainly must have known that a contractual agreement does not disappear on its own. Further, although there might have been discussions about resetting the agreement, it was not done. Discussions are discussions; they disappear into the ether. Agreements do not.The agreement set forth below is consonant with the basic Anglo-American common law notions of an enforceable contract. Once the seeds of the Agreement were sown, the were not pulled from the Agreement to be reformed, disavowed, *etc.*, until it was known after a settlement that the gross amount of money to be distributed among the firms was very large, indeed.

One of, and to my mind the cardinal one at this moment, is to address the validity and enforceability of the Agreement from its birth to the present.

On a letter dated January 19, 2016, an agreement (the "Agreement") among firms on the heading of Geoffrey McDonald, Esq., was created and, within a few days, was signed by all four firms involved in a complex class action filed the same day.

The January 19, 2016, document, reads as follows:

[GMA Letterhead]

January 19, 2016,

W. Daniel "Dee" Miles, III, Esq., Beasley-Allen, and Crow, Methvin, Portis, & Miles, P,C,
Post Office Box 4160
Montgomery, AL 36103

George "Wally" Walker, III, Esq.
The Finley Firm, P.C.
611 E. Glenn Ave
Auburn, AL 36830

Christopher Nace, Esq.
Paulson & Nace, PLLC
1615 New Hampshire Ave NW
Washington, D.C. 20009

  **Re: Richard J. Dickman and James K. Alderson,
Individually and on behalf of all those similarly situated v. Banner Life
Insurance Company and Legal & General Americas, as Legal & General
Group, PLC.**

Dear Dee, Wally, and Chris:

This letter serves as a confirmation of our agreement that an attorney's fees
collected in the above-captioned actions are to be distributed in the following
manner:

23.4% of fees to:
THE FINLEY FIRM, P.C.
611 E, Glenn Ave
Auburn, AL 36830
(334) 209-6371


35.8 % of fees to:
BEASLEY-ALLEN, CROW, METHWIN, PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
800-898-2034

35.8% of fees to:
GEOFF MCDONALD & ASSOCIATES, P.C. ("GMA")
3315 West Broad Street
Richmond, VA 23230
(804) 888-8888

5% of fees to
PAULSON & NACE, PLLC
1615 New Hampshire Ave, NW
Washington, DC 20009
(202) 463 1999

It is the understanding of the parties to this agreement that the foregoing percentages reflect, as accurately as possible, the fair and reasonable value of client acquisition and services rendered in the above-referenced matter by each of the parties hereto. Costs and expenses associated with the above matter will be split equally between Beasley-Allen and GMA. George Walker, III, Esq. will pay for his own personal travel expenses, et cetera.

Please acknowledge your acceptance of the Referral Fee Agreement below and mailing or faxing back a copy of this letter. Should you have any questions, feel free to contact the undersigned.

> Sincerely,
> /s/ Geoffrey R. McDonald, Esq.
> CEO & President

Accepted and Agreed:

/s/ George "Wally" Walker, III, Esq.                    Dated 01/22/16
The Finley Firm, P.C.

/s/ Dee Miles                                                       Dated January 20, 2016,
Beasley-Allen, Crow, Methvin, Portis, & Miles, P.C.

/s/ Christopher Nace, Esq.                                   Dated 1/26/16
Paulson & Nace, PLLC

5

/s/GM                                                    Dated 01/19/2016,
Geoff McDonald, Esq.
Geoff McDonald & Associates, P.C.


Accompanying the letter set forth above, there were similar documents signed by both named plaintiffs – Mr. Dickman on January 20, 2016, and Mr. Alderson on February 3, 2016, – "Discloser of Division Fees".  Those documents were also signed by all the lawyers who signed the letter above.  I find as a matter of law that the signatures and wording of the Disclosure Forms fully satisfied the requirement, if any, that unaffiliated firms splitting fees are required to notify and obtain the consent of their clients to act for them.

## ISSUES

I have thoroughly reviewed the above matters as proffered to me by a number of attorneys submitting a substantial set of documents.  After having read and considered the proffered matters, along with applicable law, I have come to a number of conclusions which will be addressed *seriatim*.  I did not see any substantial reason justifying a trial-like hearing to come to an appropriate result.  The written submissions were clear and did not require further examination.


## Issue I

The first issue to be dealt with, and clearly the most significant one, is whether or not the letter of January 19, 2016, (hereinafter "the Agreement) is enforceable as a matter of law.  Counsel have strong differing views on the matter.

First comes the questions of jurisdiction, both of venue and of substantive law. It is my conclusion that the United States District Court in the District of Maryland clearly has venue to examine and to render judgment on the issues raised in the matter, and that, as seems to be acknowledged by the parties, the substantive law of Maryland is to be looked to for the enforceability *vel non* of the January 16 letter as a fee-splitter.

Maryland approaches the issue of non-internalized lawyer splitting has several dimensions.  The first follow below:

## RULE OF MARYLAND LAWYERS 19-301.5. FEES (1.5)

- **(e)** A division of a fee between attorneys who are not in the same firm may be made only if:
- (1) the division is in proportion to the services performed by each attorney or each attorney assumes joint responsibility for the representation;
- (2) the client agrees to the joint representation and the agreement is confirmed in writing; and
- (3) the total fee is reasonable.

*Division of Fee*--[7] A division of fee is a single billing to a client covering the fee of two or more attorneys who are not in the same firm. A division of fee facilitates association of more than one attorney in a matter in which neither alone could serve the client as well, and most often is used when the fee is contingent and the division is between a referring attorney and a trial specialist. Section (e) of this Rule permits the attorneys to divide a fee on either the basis of the proportion of services they render or by agreement between the participating attorneys if all assume responsibility for the representation as a whole and the client agrees to the joint representation, which is confirmed in writing. Contingent fee agreements must be in a writing signed by the client and must otherwise comply with section (c) of this Rule. Joint responsibility for the representation entails financial and ethical responsibility for the representation as if the attorneys were associated in a partnership. An attorney should only refer a matter to an attorney whom the referring attorney reasonably believes is competent to handle the matter.

**Cross reference:** See *Post v. Bregman*, 349 Md. 142 (1998) and *Son v. Margolius*, 349 Md. 441 (1998).

The *Post* case cross-referenced above gives clear Maryland law relevance to this case.  That case from the State's highest court makes it clear  that the Rule on fee-splitting stated above is not a punitive rule, and it should not in all cases govern

as a fiat. *See, Alan F. Post Chartered v. Bregman, et al.,* 349 Md. 142 (1998), with relevant parts from that follow:

> The issues presented to the court through Bregman's motion were clear. Post asserted that the fee arrangement *155 provided for in the December, 1991 letters was subject to the requirements of ML RPC Rule 1.5(e), requiring either that the division be in proportion to the services performed or that, by written agreement with the client, the lawyers assume joint responsibility for the representation, and that neither condition was met. Accordingly, the arrangement was unenforceable and all that Bregman was entitled to was what would be due on a *quantum meruit* basis. Bregman, on the other hand, contended (1) that Rule 1.5(e) was an ethical rule, enforceable through the attorney grievance mechanism, but that it did not serve to affect or modify the December, 1991 agreement, and (2) even if the arrangement was subject to the rule, the rule was not violated, as there was, in fact, a joint responsibility for the representation. The latter contention was based largely on the facts that Bregman was listed as co-counsel on all pleadings and other papers, he actually performed work on the case, and Post was authorized in his retainer agreement with Taylor to engage other counsel.
>
> The court viewed the case, essentially, as a breach of contract action, to which the ethical argument made in Post's complaint for declaratory judgment was offered as a defense. It found that there was a contract between the parties—emanating from the December 1991 letter—and that the contract was clear and unambiguous. It also determined that the "ethical question is not a defense to a breach of contract between the parties," especially when one of the parties, Post, "not only entered into, but in his case made the proposal himself." Upon those findings, the court granted Bregman's motion for summary judgment with respect to the breach of contract claim and declared, as a result, that there no longer was a dispute requiring a declaratory judgment. It manifested those decisions in an order entered on June 19, 1995, granting summary judgment on Count II of Bregman's counterclaim, entering judgment in favor of Bregman in the amount of $112,881 (representing the $104,000 share of the fee, reimbursement for $2,233 in funds contributed by Bregman, and pre-judgment interest on the $106,233 from November*156 1, 1994), and dismissing Post's complaint and Count I of Bregman's counterclaim as moot.

In his appeal to the Court of Special Appeals, Post claimed that the circuit court erred (1) in finding, on summary judgment, that the fee agreement consisted only of the December letter, rather than the combination of the June and December letters, and in further finding that the agreement was clear and unambiguous, and (2) in concluding that the agreement was not governed by MLRPC Rule 1.5. On the first issue, the appellate court concluded that there was, in fact, a dispute over whether the June letter was part of the agreement between the parties, but it determined that the dispute was not a material one and that, even if the two letters are read together, the resulting agreement was clear and unambiguous. The alleged "duty" on the part of Bregman to contribute 25% to the litigation, mentioned in the June letter, was, in the court's view, a passive one: "The plain language of the contract, then, **813 specifies that appellees' role in the litigation was a passive one; no duty to contribute would arise until appellees were 'called upon.' " *Post v. Bregman, supra,* 112 Md.App. at 754, 686 A.2d at 672.

The second issue, it said, emanated from the principle established in *Von Hoffman v. Quincy,* 71 U.S. (4 Wall.) 535, 550, 18 L.Ed. 403 (1866), that parties to a contract are deemed to have contracted with knowledge of existing law and that "the laws which subsist at the time and place of the making of a contract ... enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." *Post v. Bregman, supra,* 112 Md.App. at 758, 686 A.2d at 674, quoting from *Wilmington Trust Co. v. Clark,* 289 Md. 313, 320, 424 A.2d 744, 749 (1981), quoting in turn from *Von Hoffman v. Quincy, supra.* Although recognizing that statutes constitute "law for purposes of interpreting contracts," the court drew from *Attorney Gen. of Maryland v. Waldron,* 289 Md. 683, 426 A.2d 929 (1981), "a clear distinction between legislative enactments and the legislature in general and rules passed by the judiciary for the purpose of regulating the conduct of lawyers" and concluded from that that MLRPC did not constitute *157 "laws" to be read into contracts. Nor, the court continued, did MLRPC qualify as "judicial precedent," even assuming that judicial precedent was automatically incorporated into contracts. Finally, the court turned to the concern expressed in the Scope part of MLRPC that the purpose of the rules "can be subverted when they are invoked by opposing parties as procedural weapons" and the admonition that the fact that the rules may be a basis for disciplining lawyers "does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule." To a large extent, this view followed earlier pronouncements by the Court of Special Appeals that MLRPC does not represent a reflection of public policy. *See Kersten v. Van Grack,* 92 Md.App.

466, 608 A.2d 1270 (1992); *compare,* however, *Fraidin v. Weitzman,* 93 Md.App. 168, 191, 611 A.2d 1046, 1057 (1992).

From all of this, the Court of Special Appeals concluded that "the judiciary must be extremely careful not to abuse its autonomy by extending the application of the rules it promulgates into areas not within its primary authority" and that "the enforceability in contract of fee-sharing agreements between attorneys is one such area." ⚑*Post, supra,* at 762, 686A.2d at676.

∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙

12 *169 As the Minnesota court observed in ⚑*Christensen v. Eggen,* 562 N.W.2d 806 (Minn.App.1997), although the Code constitutes a statement of important public policy, a court ought not to strike down an otherwise valid fee-sharing agreement "merely because of a minor technical deficiency with respect to the professional rules." ⚑*Id.* at 811. This Court has expressed the same view, albeit in a different context. *See Maryland Fertilizing and Manufacturing Co. v. Newman,* 60 Md. 584, 588 (1883): "Parties have the right to make their contracts in what form they please, provided they consist with the law of the land; and it is the duty of the Courts so to construe them, if possible, as to maintain them in their integrity and entirety." *See also Webster v. People's Loan, Etc. Bank,* 160 Md. 57, 61, 152 A. 815, 817(1931); *Mortgage Inv. v. Citizens Bank,* 278 Md. 505, 509, 366 A.2d 47, 49 (1976). In more direct accord with *Christensen, see Watson v. Pietranton,* 178 W.Va. 799,364 S.E.2d 812 (1987); *Breckler v. Thaler,* 87 Cal.App.3d 189, 196, 151 Cal.Rptr. 50 (Cal.Ct.App.1978) ("Attorneys should be permitted to agree in advance what division of fees there will be, so long as they make a good faith attempt at the time of agreement to anticipate the proportions of services to be performed and responsibilities to be assumed, and otherwise comply with [the applicable rule]" ).1314

When presented with a defense resting on Rule 1.5(e), the court must look to all of the circumstances—whether the rule was, in fact, violated, and, if violated (1) the nature of the alleged violation, (2) how the violation came about, (3) the extent to which the parties acted in good faith, (4) whether the lawyer raising the defense is at least equally culpable as the lawyer against whom the defense is raised and whether the defense is being raised simply to escape an otherwise valid contractual obligation,[6] (5) whether the violation *170 has some particular public importance, such that there is a public interest in not enforcing the agreement, (6) whether the client, in particular, would be

harmed by enforcing the agreement, and, in that regard, if the agreement is found to be so violative of the Rule as to be unenforceable, whether all or any part of the disputed amount should be returned to the client on the ground that, to that extent, the fee is unreasonable, and (7) any other relevant considerations. We view a violation of Rule 1.5(e), whether regarded as an external defense or as incorporated into the contract itself, as being in the nature of an equitable defense, and principles of equity ought to be applied. As we indicated, having declared Rule 1.5(e) inapplicable, the circuit court never considered these matters. It must now do so.

### JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED

Based upon the *Post* case, I shall now discuss the factors involved in Maryland law and policy as to split fees among different groups of non-affiliated counsel.

Maryland's lawyer's guideline for proper split fees among non-affiliated counsel encompasses three criteria for compliance, and they shall be dealt with *seriatim*:

(e) A division of a fee between attorneys who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each attorney or each attorney assumes joint responsibility for the representation;
(2) the client agrees to the joint representation and the agreement is confirmed in writing; and
(3) the total fee is reasonable.

- Criterion (1): I am of the opinion that this first criterion should not invalidate the Agreement. The divisions among the attorneys were carefully made in percentages in the January 2016, Agreement "in proportion to the services performed by each attorney" and to the extent it could be forecasted at that stage of the case. (It is common knowledge that the only difference between proportion and percentage is that the former is applicable to any number of items, while the latter is simply a proportion carved out from one item, most commonly in a percentage of one item, usually 100% as in this case.) I also have taken into account the factors in *Port* and find that the proportions of services made at the beginning of this case in 2016, were made in good faith based upon the foresight of those who were involved. I also find nothing in

11

the public interest harmed by the agreement, nor has there been any harm to the clients involved by the 2016, agreement; under the finalized settlement, the distribution of the attorneys' fees is irrelevant to what the class members will receive. There are no matters of equity or other relevant issues that I deem sufficient to do anything other than to apply the *Port* rules of lenience in this case.

- Criterion (2): There is no dispute regarding the original clients' awareness of the agreement to in writing, which satisfied the awareness part of the Rule.
- Criterion (3): The total legal fee, as part of the class action settlement, has been judged by the Court as reasonable. At the time the agreement was made, there was nothing at all that made the split percentages unreasonable; only a soothsayer could know the precise amount that would later constitute the cash emanating from the agreed percentages, or for that matter if anyone would wind up with a nickel, At the end of the day this is the heart of the matter, It is also notable that the members of the Agreement knew what a complex matter they were delving into with this class action case. The claim was filed January 19th, 2016, the very same day when the Agreement was dated and signed by its first signatory and by the remainders a few days later If there had been a matter of unreasonableness in either the case or the Agreements' lawyers tending to injure class action plaintiffs, Judge Bennett would certainly not have deemed such a claim or such a fee Agreement unreasonable. As noted, the way in which the case would work out from a nickel to millions was a question impossible to know *ab initio.* Finally, it is true that Mr. Nace's firm was in only for 5%, but Mr. Nace was acting only as local counsel at the time of the filing and was obviously willing to ask for and be given a much lower percentage than any of the other counsel who signed the agreement. (N.B. Mr. Nace and his firm have not taken any position on the matters covered in this Report and Recommendation. As no other signer of the Agreement has implicated Mr. Nace in any way or any issue, his 5% will be properly paid when allocation is ripe.)

The specific issues addressed above are exemplars. In deciding whether this case fits within the *Post* criteria I have considered "all of the circumstances" as it suggests, including the seven matters set forth in that case, and I find that, as a whole, the Agreement in this case is not unlawful or unenforceable under Maryland law.

As a side note, if this Agreement issue were to come before an Alabama court (where it was drafted), the non-retaliatory aspect of Maryland law of fee splits set forth in the *Post* case would be viewed the same by both States:

We conclude that the trial court erred to the extent that it determined the parties' agreement to be unenforceable as violative of Rule 1.5(e), Ala. R. Prof. Cond. As discussed in the Scope of the Alabama Rules of Professional Conduct and in the above-cited authorities, the sole remedy for a violation of Rule 1.5(e) is disciplinary in nature; therefore, the trial court lacked the authority to declare the parties' agreement unenforceable as violative of Rule 1.5(e).

*Poole v. Prince*, 61 So.3d 258 (AL 2010).

## Report and Recommendation to the Court on Issue 1

The Special Master hereby reports and recommends pursuant to the Court's Stipulated Order of 29 May, 2020, that the Agreement of January 19, 2016, is not illegal under the laws of Maryland (or Alabama), is enforceable as an agreement by law, and finds that the Agreement was lawful when signed and remains so to this date.

## Issue 2

The next Issue is whether the Special Master should conduct a hearing replete with discovery, possibly subpoenas, depositions, *viva voce* testimony, *etc.,* essentially matching the equivalent of a full-blown bench trial before applying the Agreement to the grievances of  Mr. Walker and of GMA for submission to the Court.

I shall look at this issue in two separate sub-issues, because the two individuals who seek modification of the Agreement are in two rather different positions.

## Issue 2(a)  Mr. Walker

Mr. Walker has asked for the equivalent of a full-blown hearing in this Court to fix how much money he is entitled to receive from the Finley Firm out of its 23.4 % percentage of January 2016, agreement money. The purpose of the hearing would be irrelevant as to the validity of the Agreement discussed above. Rather, it would be to determine what the Finley Firm owes Mr. Walker. Such an internecine dispute between members of a firm does not belong in this Federal Court for resolution.

The reason is simple:

The Agreement of January 19, 2016, did not grant Mr. Walker personally any percentage of the 100 % splits in the Agreement. Therefore, he is not an interested party as to the percentage split. In fact, Mr. Walker was not just a small apple in the creation of the Agreement and of the Finley firm as to the specific percentage due that firm. The Agreement lists "George "Wally" Walker, III, Esq. just above The Finley Firm, P.C., not on his own behalf, but on that of the Finley Firm. Additionally, it is also obvious that Mr. Walker was not signing in his own behalf when he signed page 2, but signing for the Finley Firm; he clearly signed his name over an entity representing a firm, as did other signers. Finally, it was to the Finley Firm that the percentage of 23.4 % was "distributed in the following manner." That manner was clearly not directed to Mr. Walker, but only to the Finley Firm.

For the reasons stated above, Mr. Walker is not entitled to seek a percentage of the $7,851,001.08 million directly to himself. It must come through Finley up until Mr. Walker left that firm years after the Agreement was executed. Simply put, he was not a party to the Agreement; his work was part of his connection with the Finley Firm, and Mr. Walker was acting for the Finley Firm. If Mr. Walker feels that during the prosecution of the class action, he was not paid by Finley as Finley should have done and is now owed money from Finley, that has nothing to do with this Court's duty to see that the moneys achieved are distributed to the firms that were signatories of the Agreement, not to any particular lawyer within a firm. If Mr. Walker feels he has been denied what he claims he is owed between him and Finley, the appropriate solution for Mr. Walker is to file a separate claim for common law or equity relief in an appropriate court.

## Issue 2(b)

This issue is a dispute between two parties to the agreement, the Geoff McDonald (GMA) Firm and the Beasley-Allen Firm. In the Agreement, these two firms were willing to sign percentages of 35.8% of fees each. Now, Beasley-Allen claims that it should get more money than GMA (both of which worked on the case), because Beasley-Allen did more work than GMA in the prosecution of the class action case. The answer to this claim is essentially in *pari materia* with that of the Walker-Finley answer.

There was an Agreement signed by both firms. At the time, a specific percentage of profits was allocated to each of these two firms. The Agreement was signed by those firms. Neither had just "fallen off the turnip truck." If they had simply done a deal through a cell phone call, it would be a different story from the very specific written Agreement among the firms that was signed. Furthermore, the language of the Agreement did not tie any particular amount of work needed to acquire the percentage, given that no one knew if they would get any money from the case, or who would do what, as the case went forward. Finally, the language in the agreement is a key part of the story. To refresh recollection, it states: "It is the understanding of the parties to this agreement that the foregoing percentages reflect, as accurately as possible, the fair and reasonable value of client acquisition and services rendered …."

Beasley-Allen has claimed that the entry of a second defendant, Penn, during the pre-settlement period is not within the scope of the Agreement, and that it should be able to have a higher split than the one it agreed to in the Agreement of 2016, on account of increased effort including work with Penn, which apparently had not been taken into account at the time the Agreement was signed. The difficulty here is that Penn was connected with the original defendant, and not simply just one out of the blue. The entry of an affiliated firm by the defendant was one of the things that was not known at the time of the Agreement, but was not outside the pale and scope of the Agreement's written intentions in January of 2016, when the case was simultaneously filed.

15

Given the foregoing finding that the Agreement is legal and must be observed among the parties as written by their signatures therein, the Agreement should not be changed by this Court.

## Report and Recommendation to the Court on Issues 2(a) and (b)

For the reasons stated above, the Special Master reports and recommends to the Court that the Agreement of January 19, 2016, has been found lawful and proper and as setting forth clearly the matters agreed upon by the four firms, In the circumstances, I recommend that the Court deny the relief sought by Beasley-Allen vs. GMA and by Mr. Walker vs. the Finley Firm in this Court, but without prejudice for those entities to settle their own disputes via common law or equity litigation in an appropriate venue.

## Issue 3 with Report and Recommendation

The next issue has to do with Mr. Walker's relationship with the Finley and the Boles firms. (Boles was not a signatory.) It is stated that Mr. Walker left the Finley firm by voluntary retirement after Judge Bennett had preliminarily approved settlement of the case. If work on this case was done for Boles through Mr. Walker after his separation from Finley in the end of November, then it should be appropriately deducted from the $7,851,001.08 million general fee fund.

I suggest that the Court direct both Mr. Walker and the Boles Firm each to file simultaneously to the Court documents within 30 days after this Report and Recommendation is – assuming it is – affirmed by Judge Bennett under Fed.R.Civ. P. 53. Such documents should consist of time sheets, invoices, etc., worked in the Boles Firm after Mr. Walker's November resignation from the Finley Firm and be signed under oath by Mr. Walker and a Boles partner. The documents will be only for work done after Mr. Walker's resignation from Finley on November 30, 2019. I suggest that such amount be appropriately subtracted from the $7,851,001.08 and turned over to the Boles Firm to be settled up with Mr. Walker.

## Report and Recommendation to the Court on Issue 3

For the reasons stated above, I recommend to the Court that Mr. Walker and the Boles Firm working together be drawn out of the $7,851,001.08 on the terms stated above.

## Issue 4 with Report and Recommendation

This issue is forward looking timing of distribution. The "unknown known" of a final legal fee allocation of dollars is not yet ready for distribution, due both to the changes that will accompany the appellate process, the Court's decisions on the Recommendations hereinabove, or matters not yet raised. I suggest that the $7,851,001.08 million dollars be held in escrow and remain that way until after all appellate court rulings are finished and nothing remains of the case other than a final distribution of the money among counsel, if the Court so agrees. If not, of course, the Court is free to direct that a percentage of, or the whole amount of, $7,851,001.08, be distributed now, without waiting for an appellate decision.

ALL THE ABOVE REPORTED AND RECOMMENDED PURSUANT TO FED.R.CIV.P 53 AND THE ORDERS OF THE HONORABLE RICHARD D. BENNETT, THIS 17th DAY OF NOVEMBER, 2020:

Frederic N. Smalkin

Special Master

## PROOF OF SERVICE BY E-Mail

Re: Dickman, et al. / Banner Life Insurance Company, et al.
Reference No. 1410008534


I, Teresa Menendez, not a party to the within action, hereby declare that on November 17, 2020, I served

the attached Special Master's Report and Recommendation on the Law Clerk to the Honorable Richard D.

Bennett in the within action by electronic mail at Washington, DISTRICT OF COLUMBIA, addressed as

follows:

Catherine Gamper Esq.
United States District Court for the District of Maryland
101 W. Lombard St.
Chambers 5D
Baltimore, MD   21201
Phone: 410-962-2600
catherine_gamper@mdd.uscourts.gov


I declare under penalty of perjury the foregoing to be true and correct. Executed at Washington,

DISTRICT OF COLUMBIA on November 17, 2020.


 /s/ Teresa Menendez
Teresa Menendez
JAMS
tmenendez@jamsadr.com